UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ARMANDO HERNANDEZ,           §
TDCJ-CID NO. 1219401,        §
        Petitioner,     §
v.                           §          CIVIL ACTION NO. H-10-3938
                      §
RICK THALER,                 §
        Respondent.     §

OPINION ON DISMISSAL

      Petitioner Armando Hernandez,[1] an inmate incarcerated in the Texas Department of Criminal Justice – Correctional Institutions Division ("TDCJ-CID"), has filed through counsel a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his felony conviction for capital murder.  (Docket Entry No.1).  Respondent has filed a motion for summary judgment.  (Docket Entry No.10).  Petitioner has filed a response to the motion.  (Docket Entry No.13).  After considering all of the pleadings and the entire record, the Court will grant respondent's motion for summary judgment, and dismiss this habeas petition.

I. BACKGROUND AND PROCEDURAL HISTORY

      A jury in the 177th Criminal District Court of Harris County, Texas, heard the following evidence in cause number 939761, as summarized by the Fourteenth Court of Appeals, in pertinent part:

> On January 29, 2003, after recruiting Michael Salazar to drive and Juan Pena to accompany him, appellant went to [Christopher] Harrell's house ostensibly to sell Harrell some crack cocaine.  Harrell was then shot and killed in his living room.  The evidence showed one bullet missed Harrell, but he then was shot in his face as he stood in his living room, and was shot in his temple after he fell to the floor.

---
[1] Trial records reflect that petitioner's nickname is Mando.

> After Harrell was shot, appellant and [Juan] Pena took Harrell's guns and also took ammunition, fishing equipment, and other items from Harrell's house. Appellant and Pena carried the property to the car and told Salazar to drive to Anthony Tunal's house, where they would store the stolen property temporarily. On the way, appellant rolled down the car window and threw a handgun out of the window as they passed over the river. Salazar testified that he asked appellant what he was doing and what had happened, and appellant responded, "I shot him." Salazar asked, "Is he dead?" Appellant said, "I think so."
>
> That night, appellant and Pena burned clothing at Petra Cortina's house. Appellant asked Cortina to help him find a buyer for the stolen weapons, and appellant eventually sold the weapons for money and drugs. He gave a portion of the drugs to Pena and Cortina.

*Hernandez v. State*, 171 S.W.3d 347, 352 (Tex. App.–Houston [14th Dist.] 2005, pet. ref'd) (finding such evidence sufficient to convict petitioner as a principal).[2] "Cortina also testified that, before the incident, appellant told her he was having 'money problems' and to get some he 'had a lick,' which she understood to mean he intended to kill someone for something." *Id.* n. 4.

The jury also heard Ramon Villareal testify that petitioner had formulated a plan to rob Harrell and tried to recruit Villareal to help. *Id.* at 354. Villareal further testified that "appellant told him that, because appellant knew Harrell, appellant would have to kill him." *Id.*

Petitioner also testified during the guilt phase of trial, as summarized by the Fourteenth Court of Appeals:

> [A]ppellant testified that he had been laid off from his job and was behind on his bills, so he decided to rob Christopher Harrell of his guns. Appellant had sold drugs to Harrell for several years and knew he owned at least one handgun and an assault rifle. He initially asked Ramon Villareal to help him rob Harrell, but when Villareal refused, appellant asked Juan Pena to go with him. Appellant told Michael Salazar about his plan to rob Harrell and asked Salazar if he would drive him to Harrell's house. Appellant told Salazar that his plan was to wrestle Harrell down and tie him up with duct tape. According to appellant, neither he nor Pena brought a weapon to Harrell's house.

---

[2] The Fourteenth Court of Appeals also found sufficient evidence to support petitioner's conviction as a party. *Hernandez v. State*, 171 S.W.3d 347, 355 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd).

Appellant testified that, on January 29, 2003, Harrell had called him and asked for some drugs. Appellant called Harrell to tell him he was on the way to his house to bring him the drugs. Salazar drove appellant and Pena. When they arrived, Harrell, appellant, and Pena went inside; Salazar waited outside. In the house, appellant saw Harrell and Pena smoking crack cocaine, and he asked to use the restroom. According to appellant, his plan included having Harrell and Pena get high, and then "we were going to catch him off guard and wrestle him up and tape him up." When appellant came out of the restroom, he saw Harrell showing Pena a gun. As appellant watched, Pena shot Harrell twice. Appellant denied that he planned or intended the shooting. After Pena shot Harrell, appellant collected Harrell's guns and other items, and he, Pena, and Salazar left. At some point as they drove, Pena handed appellant a handgun, and, while they were crossing a bridge, appellant threw it out the car window into the river below. The handgun was never recovered.

*Id.* at 352.

The jury convicted petitioner of capital murder. (Docket Entry No.7, page 39). Following a punishment hearing, the jury assessed punishment at confinement for life in TDCJ-CID. (*Id.*). On direct appeal, petitioner maintained that he did not intend to kill complainant, only to rob him; he challenged his conviction on the following grounds:

1.   The state district court erred in not charging the jury on the lesser-included offense of theft;

2.   The evidence was legally insufficient to prove that he was guilty of a party to capital murder;

3.   The state district court erred in excluding a statement that petitioner made, which was material to his defense;

4.   The state district court erred in overruling his objection to improper jury argument;

5.   He was denied due process by the state district court's instruction allowing a finding of guilt based on conspiracy, which was not alleged in the indictment; and,

6.   The state district court erred in allowing the State to offer extraneous offense evidence of petitioner's drug transactions in violation of state evidentiary rules.

*Hernandez*, 171 S.W.3d at 351. The state appellate court affirmed the judgment of the state district court and the Texas Court of Criminal Appeals refused his petition for discretionary review. *Id.* at 347.

During this time, accomplice Michael Salazar, who testified against petitioner pursuant to an agreement with the prosecutor, was convicted of aggravated robbery; he was sentenced in November 2004, to ten years confinement in TDCJ. (Docket Entry No.7-1, page 92). Because he had anticipated that he would be given deferred adjudication probation, Salazar filed a motion for new trial alleging that his trial attorney Tom Wilbern had rendered ineffective assistance of counsel by failing "to call witnesses who could better explain the defendant's remorseful attitude and his fear of his codefendants." (Docket Entries No.7-26, page 117-118; No.7-30, page 29).

Thereafter, petitioner sought state habeas relief from his conviction through counsel on the following grounds:

1. He was denied the right to present a defense by the state district court's failure to admit evidence that his co-defendant's shooting of complainant was neither planned nor foreseeable;

2. He was denied the right to confront State's witness Petra Cortina about petitioner's state of mind during the commission of the offense;

3. He was denied due process by the State's objection to evidence favorable to petitioner;

4. He was denied due process by the State's inconsistent theories proffered at petitioner's trial and co-defendant Juan Pena's trial;

5. He was denied due process and due course of law because exculpatory DNA results were not available to him prior to trial;

6. He was denied due process of law because State witness Michael Salazar misrepresented to the jury the benefits he received for his cooperation and testimony against petitioner; and,

4

       7.     He was denied due process of law because State's witness Ramon Villarreal gave false testimony.

(Docket Entry No.7, pages 13-20).  The state district court, sitting as a habeas court, held a hearing on petitioner's challenge to the State's agreement with Salazar in exchange for his testimony and the alleged inconsistencies in the trial of petitioner and the trial of co-defendant Pena.  (Docket Entry No.7-30, pages 2-143).  The state habeas court recommended that relief be denied and entered written findings.  (Docket Entry No.7-1, pages 90-104).  The Texas Court of Criminal Appeals denied the application without a written order on the findings of the trial court after a hearing.  (Docket Entry No.7, page 2).

      In the pending action, petitioner seeks federal habeas relief on the following grounds:

       1.     He was denied due process because State's witness Michael Salazar failed to disclose at trial that he received certain benefits in exchange for his cooperation;

       2.     He was denied the right to present a defense because the state district court excluded evidence showing that his co-defendant's actions were not planned or foreseeable;

       3.     He was denied the right to confrontation because the state district court limited his cross-examination of a State's witness; and,

       4.     His conviction violates due process because the State used a different factual theory in his trial than it used in the trial of a co-defendant.

(Docket Entries No.1, No.13).

      Respondent moves for summary judgment on grounds that petitioner has failed to meet his burden of proof under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and his claims fail on the merits.  (Docket Entry No.10).

## II. DISCUSSION

The AEDPA, which "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt," codifies traditional principles of finality, comity, and federalism that underlie the limited scope of federal habeas review. *Renico v. Lett*, --- U.S. ----, 130 S.Ct. 1855, 1862 (2010) (quotations omitted). Under the AEDPA, "a federal court cannot grant a petition for a writ of habeas corpus unless the state court's adjudication of the merits was 'contrary to, or involved an unreasonable application of, clearly established Federal law.'" *Berghuis v. Thompkins*, --- U.S. ----, 130 S.Ct. 2250, 2258 (2010) (quoting 28 U.S.C. § 2254(d) (1)). A habeas petitioner may only obtain relief (1) "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts," or (2) "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). Clearly established federal law comprises "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Id.* at 412. A state court decision is contrary to federal law when it "identifies the correct governing legal rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case," *id.* at 413, or where it "extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407. "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable--a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). Simply put, the AEDPA

"prevents defendants-and federal courts-from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico*, --- U.S. at ----, 130 S.Ct. at 1866. In other words, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, --- U.S. ----, 131 S.Ct. 770, 786-87 (2011).

Summary judgment is proper when the record shows "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In ordinary civil cases, a district court considering a motion for summary judgment must construe disputed facts in a light most favorable to the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (noting that "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor").  "As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000).  However, a court on summary judgment must view the evidence through "the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254.  Congress, through the AEDPA, has constricted both the nature and availability of habeas review.  This Court, therefore, applies general summary judgment standards only insofar as they do not conflict with the language and intent of the AEDPA.  *See Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002) (finding that "[Rule 56] applies only to the extent that it does not conflict with the habeas rules"), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004).

This Court reviews the state court's "ultimate decision" for unreasonableness. *Charles v. Thaler*, 629 F.3d 494, 501 (5th Cir. 2011).  Although the Court reviews the decision of the Texas Court of Criminal Appeals in this case, the Court gives significant deference to a state district court's resolution of factual issues.  *See Moody v. Quarterman*, 476 F.3d 260, 267-68 (5th Cir. 2007).  In this case, the state courts issued detailed findings of fact and explicit conclusions of law with respect to each exhausted claim.  A federal habeas court must presume the underlying factual determinations of the state court to be correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence."  *See* 28 U.S.C. § 2254(e)(1).

## A. Undisclosed Benefits

Petitioner contends that his due process rights were violated at trial when accomplice Michael Salazar failed to disclose to the jury the full extent of the benefits he expected to receive for testifying against petitioner and for his cooperation with the State. (Docket Entry No.1, pages 20-21).  Under *Brady v. Maryland*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. 83, 87 (1963).  The Supreme Court subsequently extended this principle to impeachment evidence, holding that "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule."  *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)); *see also United States v. Bagley*, 473 U.S. 667, 676-77 (1985) (rejecting any distinction between exculpatory and impeachment evidence for *Brady* purposes).  "Where . . . the witness's credibility 'was an important issue in the case . . . evidence

of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it.'"  *Tassin v. Cain*, 517 F.3d 770, 778 (5th Cir. 2008) (quoting *Giglio*, 405 U.S. at 154-55).

Petitioner contends that Salazar was the State's star witness in rebutting petitioner's claim that he only intended to rob the complainant of his guns and that Salazar presented the only evidence directly connecting petitioner to the shooting.  (*Id.*, page 17).  He acknowledges that Salazar disclosed some of the benefits promised to him at trial but claims that Salazar did not disclose the following benefits that are relevant to his credibility:

1.  The State would not charge him with any additional offenses discovered as a result of his cooperation;

2.  The state district judge would grant him deferred adjudication probation; and

3.  The prosecutor would tell the state district judge at sentencing that Salazar was a good candidate for probation.

(Docket Entry No.1, pages 20-21).

To establish a *Brady* violation, the movant must show that (1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant because it was either exculpatory or impeaching; and (3) the evidence was material.  *United States v. Sipe*, 388 F.3d 471, 477 (5th Cir. 2004); *see also Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  To show that the state court's proceeding resulted in a "decision that was contrary to, or involved an unreasonable application of clearly established Federal Law," petitioner must show that the prosecution's failure to disclose such evidence constituted a violation of due process pursuant to *Brady* and that the state court's application of *Brady* was unreasonable.  *See Mahler v. Kaylo*, 537 F.3d 494, 499 (5th Cir. 2008).

After considering the testimony presented at an evidentiary hearing on this issue, the trial record, and the affidavits of attorneys involved in the case, the state habeas court found no evidence of an understanding or agreement that Salazar would receive deferred adjudication probation in exchange for his testimony against petitioner and Pena and his cooperation with the State. The state habeas court found prosecutor Mia Magness's affidavit[3] and the "State's Notice of Benefits and Leniency Afforded Witnesses," which was filed in the Harris County Clerk's Office, summarized the complete agreement between the State and Salazar.[4] (Docket Entry No.7-1, page 92). Magness delivered a copy of the "State's Notice of Benefits and Leniency Afforded Witnesses" to petitioner's attorney, Stafford, prior to trial. (*Id.*). The state habeas court also found that

---

[3] Magness attested that she had numerous conversations with petitioner's trial counsel James Stafford and that he indicated he understood the benefits Salazar would receive for his cooperation. (Docket Entry No.7, pages 134-35). Magness attested that she never promised or otherwise informed Salazar or his counsel that Salazar would received deferred adjudication for his cooperation. (*Id.*, page 136). Magness further attested that Salazar testified fully and accurately regarding the benefits that he would receive and he did not withhold any benefits from either party, the court, or the jury. (*Id.*, page 137).

[4] The Notice stated the following with respect to Salazar:

> In exchange for Mr. Salazar's initial cooperation with Detectives Coleman and Hoffman of the Harris County Sheriff's Department, the State agreed to charge Mr. Salazar with Aggravated Robbery, Cause No.942359, instead of Capital Murder. The State further agreed to reduce Mr. Salazar's bond from "no bond" to $10,000.
>
> In exchange for his agreement to truthfully testify against Armando Hernandez, Jr., the State has agreed to waive jury trial and allow Mr. Salazar to enter a plea of guilty to Aggravated Robbery in Cause No.942359. The State has agreed to cap the punishment available at sentencing to 30 years incarceration in the Texas Department of Criminal Justice and a possible $5,000 fine. The State has further agreed to inform the Court, prior to Mr. Salazar's sentencing, that he has cooperated with the Harris County Sheriff's Department and the Harris County District Attorney's in the investigation and prosecution of the Capital Murder of Christopher Harrell. Should Mr. Salazar be sentenced to penitentiary time, the State has agreed to write a letter to the Board of Pardons and Paroles detailing Mr. Salazar's cooperation with law enforcement.
>
> Please see attached Exhibit A for documentation of the entire agreement between the State of Texas and Michael Salazar. Said exhibit documents the entire agreement with this witness. No other promises of benefits or leniency, express or implied, have been made to this witness.

(Docket Entry No.7-4, page 75). Exhibit A is letter from the prosecutor to Salazar's attorney, Tom Wilbern, which states the same. (*Id.*, page 77).

35.     [T]he State fully and truthfully disclosed to the applicant the entirety of its agreement with Salazar prior to the applicant's trial.

*     *     *     *     *

39.     Salazar never confessed to any other offenses during his cooperation with the State other than the aggravated robbery to which he pled guilty in cause no. 942359.

*     *     *     *     *

44.     Salazar was never promised that he would get probation in connection with his plea agreement.

45.     Salazar . . . never believed that he was promised or otherwise guaranteed that he would receive a  probated sentence from the trial court in connection with his plea agreement.

46.     Salazar filed a motion for new trial alleging that Wilbern rendered ineffective assistance of counsel for failing to present sufficient evidence to convince the trial court that prison would be dangerous for Salazar and to give him a probated sentence; the motion for new trial did not allege that Salazar had been promised probation.

*     *     *     *     *

49.     Salazar's testimony at trial was not materially different than his February 17, 2003[,] and February 18, 2003[,] statements to police.

50.     Wilbern's ultimate goal in negotiating the plea agreement was that he hoped the Court would give Salazar deferred adjudication probation, but that Wilbern never promised or otherwise guaranteed to Salazar that he would get probation.

51.     Salazar disclosed the scope of the benefits he received in return for his cooperation with the State during his testimony at the applicant's trial.

52.     Salazar did not fail to disclose any tacit agreement that he would receive probation during his testimony at the applicant's trial.

53.     Salazar did not misrepresent the scope of the benefits he received in return for his cooperation with the State.

(Docket Entry No.7-1, pages 96-100) (citations to record omitted).

Citing *Giglio v. State*, 405 U.S. 150 (1972), the state district court entered the following Conclusion of Law:

> 5.     The applicant was not denied due process because the State fully and truthfully disclosed to the applicant prior to trial the entirety of its agreement with Salazar, because Salazar was never promised that he would receive probation in exchange for his cooperation with the State, because Salazar never confessed to any other offenses during his cooperation with the State, and because Salazar did not misrepresent the scope of the benefits he received in return for his cooperation.

(*Id.*, page 103).

The Court presumes that the state court's factual findings are correct.  In rebuttal, petitioner claims that the record shows material fact issues as to whether Salazar fully disclosed at trial the benefits he would receive in return for his cooperation.  (Docket Entry No.13, page 4). Petitioner claims that "[t]he record of the state habeas proceedings shows that Salazar's expectations and beliefs the he would receive probation were fomented through representations made by his counsel, and through his meeting with the prosecutor."  (*Id.*, page 5).  Petitioner points to Salazar's statements that "the main thing we were going for was probation" and Salazar's belief "that as long as he testified and testified truthfully, he would be sentenced to deferred adjudication probation."  (*Id.*, page 6).  Petitioner also cites Salazar's statement that based on his conversation with Attorney Wilbern, "he believed in return for his cooperation he would be sentenced to probation."  (*Id.*).  Petitioner further cites to Attorney Wilbern's testimony that the prosecutor represented to him that Salazar "was a good candidate for probation and that opinion would be emphasized to the court at sentencing."  (*Id.*).  Petitioner also challenges the state court's adjudication of this claim as being too narrowly focused on the State's understanding of the agreement and not Salazar's and Wilbern's belief or understanding of the agreement.  (*Id.*, page 4).

The parties do not contest that Salazar did not testify at petitioner's trial that he anticipated being placed on deferred adjudication probation or that the prosecutor had agreed that no additional charges would be filed against him.  With respect to the latter, petitioner's counsel conceded during state habeas proceedings that the issue of whether Salazar failed to testify that no charges would be filed against him was a moot or harmless issue because the State had stipulated that there were no other charges; nevertheless, he wanted the issue to be part of the claim before the court.  (Docket Entry No.7-30, page 11).  At the state habeas hearing, Salazar testified that part of the State's agreement was that he would not get prosecuted for crimes other than aggravated robbery, but that there were no other criminal acts that were disclosed.  (*Id.*, pages 33-34).  Salazar indicated that the agreement did not state that he was not going to be prosecuted for other offenses but that he would be charged with aggravated robbery.  (*Id.*, page 33).  Salazar did not want to be prosecuted for capital murder, which he thought was a real possibility.  (*Id.*, page 34).  He testified that there were no other criminal acts that he feared they would discover and prosecute him.  (*Id.*).

With respect to petitioner's claim that Salazar did not inform the jury that the prosecutor agreed to inform the sentencing judge that he was a good candidate for probation, the trial record shows Salazar told the jury in response to the prosecutor's question that the prosecutor agreed to tell the judge how much his cooperation helped.  (Docket Entry No.7-44, page 26).  The issue was not contested during state habeas proceedings.

The chief fact issues in the state habeas proceedings were whether Salazar testified during petitioner's trial with the belief that he would receive deferred adjudication

probation and, if so, on what basis he formed such belief.[5]  (Docket Entry No.7-30, pages 8-10).

The record of the proceedings supports the state habeas court's findings.[6]

        Salazar testified that he and his attorney planned to ask the sentencing judge to

grant him deferred adjudication probation and that they anticipated that the judge would grant

their request for several reasons but not because of any promise or tacit understanding or

agreement with the State.  (Docket Entry No.7-30, page 40).  Salazar explained that that he had

---

[5] During state habeas proceedings, petitioner's counsel agreed with the State that there was no issue or claim "that the State did not fully disclose its agreement or arrangement with Mr. Salazar to Mr. Hernandez's attorney." (Docket Entry No.7-30, pages 4-5).  Petitioner's counsel noted that "[w]hat Ms. Magness may have told his lawyer may be totally different than what his understanding and expectations were."  (*Id.*, page 5).  Assistant District Attorney Roady noted that the original pleading stated "that there was an undisclosed tacit agreement of probation between the prosecutor and Mr. Salazar's attorney; and my understanding now is that that is no longer the claim.  There's not a habeas claim that there was an undisclosed promise of probation, but instead the claim is now that Mr. Salazar's understanding of the promise may have been different than what his attorney led him to believe."  (Docket Entry No.7-30, page 6).  Petitioner's counsel, Mr. Lieberman, responded that petitioner "generally pled that he misrepresented at trial what benefits he was going to receive regardless of who[m] was telling him that."  (*Id.*, page 10).

[6] In her opening statements at trial, prosecutor Mia Magness introduced Michael Salazar as "another participant in this offense.  He is a coactor.  He is an accomplice."  (Docket Entry No.7-42, page 10).  She also told the jury that "he's going to make a promise to tell the truth and that's what he's going to do.  And he's going to tell you-all about how this defendant got him involved in this mess that led to the death of Christopher Harrell."  (*Id.*)  She also told the jury that "[y]ou're going to hear that Michael Salazar cut a deal.  I'm not going to hide that from you.  I'm going to tell you exactly what he's getting in exchange for his cooperation and his testimony."  (*Id.*).  She then summarized Salazar's anticipated testimony.  (*Id.*).

At trial, Salazar testified that for cooperating with the police, he was charged with aggravated robbery instead of capital murder.  (Docket Entry No.7-44, page 26).  He also testified that once his case came into court, his bond was set at $10,000, instead of $30,000.  (*Id.*).  He further testified that if he did not testify truthfully in court that the prosecutor would charge him with aggravated perjury and that in exchange for his truthful testimony, he entered a plea of guilty to aggravated robbery, a first degree felony.  (*Id.*).  He testified that the range of punishment for such felony is five to 99 years or life but in exchange for his cooperation, the prosecutor capped the punishment range at 30 years and a $5,000 fine.  (*Id.*).  Salazar specifically testified that the prosecutor had not promised that he was going to get probation or a certain number of years but that the judge would decide his punishment.  (*Id.*).  He also testified that his attorney had not told him that he was going to get any specific punishment and that he understood he could get thirty years.  (*Id.*).  Salazar testified that the prosecutor had agreed that if the judge sent him to prison, she would write a letter to the parole board and tell them of his cooperation with the investigators, and that when he was sentenced, she would tell the judge how much his cooperation helped.  (*Id.*).  Salazar indicated that the prosecutor did not make any other promises to him.  (*Id.*, page 27).

Although Salazar testified that petitioner told him that he shot complainant, the prosecutor did not seek a jury verdict on that testimony alone in her closing statement to jurors.  She argued that the charge permitted the jury to convict petitioner of capital murder on one of the several theories regardless of whether they believed petitioner was the triggerman, including a theory that he had an agreement with Salazar and Pena to rob complainant and in the furtherance of the agreement to commit robbery, the killing occurred and he should have know it was going to happen.  (Docket Entry No.7-47, page 5).

14

maintained a job, had not committed any other offense, had cooperated with the State, and testified against petitioner and Pena.[7]   (*Id.*, page 31-32).   Salazar further testified that he understood the terms of the agreement with the State and the possible sentence the judge might impose.   He explained that both his attorney and the prosecutor had told him that he was a good candidate for probation, that the State would not oppose probation, and that they did not think the judge would give him the full thirty years.[8]   (*Id.*, page 70-71).   He understood that Attorney Wilbern's plan was to ask the judge to award him probation but that no one, not the state district judge, the prosecutor, or his attorney, promised him or told him that he would receive probation.[9]

(*Id.*, page 40).   Salazar testified that he did not think the state district judge would send him to

---

[7] When asked if there were things that he was promised or that he believed would happen that were not contained in the plea agreement, Salazar testified that "[t]he main thing we were going for was probation."   (Docket Entry No.7-30, pages 21-22).   He indicated that he understood that his sentence was capped at thirty years compared to life and agreed that the plea agreement made no mention of the cap.   (*Id.,* pages 22-26).   Salazar agreed that he believed from conversations with his lawyer that he had to do two things to get deferred adjudication—be truthful and be willing to testify as many times as they needed you to testify.   (*Id.*, page 27).   Salazar agreed that it occurred to him that he could be sentenced to prison time but he thought that because he stayed out of trouble, maintained a job, and testified at both trials, the judge would given him probation to keep him from going to prison based on what his lawyer said.   (*Id.*, pages 31-32).   Salazar testified, "That's what we were going for, probation."   (*Id.*, page 32).

[8] Salazar testified when questioned by the state district court that he and Attorney Wilbern had met with the prosecutor on January 9, 2004, and read the terms of the agreement together.   He understood that the state district judge did not have to go along with the thirty year cap but that the cap was the State's agreement for his testimony.   (Docket Entry No.7-30, pages 70-71).   He did not believe that he would get thirty years because when he talked to the prosecutor about the cap, she said that she did not believe that the judge would sentence him to the whole thirty years.   (*Id.*, page 71).   He testified that the prosecutor also told him at the meeting that he was a good candidate for probation.   (*Id.*).   Salazar indicated that the prosecutor told the judge the same at his sentencing hearing.   (*Id.*).

Salazar also testified that Attorney Wilbern told him that he did not think he would get thirty years, but he did not tell Salazar what he would get, "but just the main thing we were trying to get was probation."   (*Id.*, page 72).   When asked directly what made him believe that he would receive probation, Salazar explained "[i]t was my presentence investigation, that was the thing that my lawyer, Tom Willbern, was going to ask for probation and Mia Magness wouldn't oppose to it."   (*Id.,* page 73).   Salazar indicated that the plan for the sentencing hearing was for plaintiff to testify that he had been out on bond, had testified at both trials, and kept a job.   (*Id.*, page 74).   Salazar and Wilbern did not discuss character witnesses or the dangers in the penitentiary.   (*Id.*).

[9] Salazar testified that Attorney Wilburn told him that there was no agreement with respect to the range of punishment in his case, and that on the sentencing date, they were going to ask for probation.   (Docket Entry No.7-30, pages 39-40).

prison considering the dangers he faced after testifying against two men who received life sentences.[10]  (*Id.*, page 63).

Salazar also testified that after sentencing and incarceration, he filed a motion for new trial complaining of ineffective assistance of counsel because Attorney Wilbern had not called any character witnesses to testify to the dangers Salazar faced in prison.[11]  (*Id.*, pages 29, 47-56).  Salazar felt that Wilbern should have pushed the probation issue more at the PSI hearing.[12]  (*Id.*, page 59).

Attorney Tom Wilbern testified that in discussions with the prosecutor, the ultimate result he was trying to obtain for Salazar was deferred probation.  (*Id.*, pages 85-86). He informed Salazar that probation was the goal but he did not tell him that he was going to get probation.  (*Id.*, page 86).  Wilbern testified, "I told him that based upon his testimony in both trials and as time progressed that the range of punishment would be capped.  At that point it was capped at 30 years.  And that we would try to get him probation."  (*Id.*).  He explained to Salazar that probation was not a guarantee.  (*Id.*).  Wilbern testified that he believed Salazar understood

---

[10] Upon questioning by the state habeas court, Salazar indicated that part of his thought processes in believing that he would receive probation was the fact that he was testifying in two capital cases where the defendants received life sentences and the dangers he faced for having done so.  (Docket Entry No.7-30, page 63).  Salazar testified that he began thinking about the dangers of testifying against petitioner and Pena before trial even started because he still lived in the same neighborhood where they were from.  (*Id.*, pages 63-64).  Salazar testified that Attorney Wilbern "told me to stay out of trouble and continue do[ing] what you're doing by working and stuff and hopefully that will be the outcome, the probation, if you show the Court that you could maintain in society."  (*Id.*, page 65).  Salazar stated that although he had discussed with Wilbern the dangers he faced in the neighborhood for testifying, he did not discuss with Wilbern the dangers he faced in prison for testifying, because Salazar did not think he was going to prison.  (*Id.*, page 66).

[11] Salazar testified that he filed a motion for new trial after he was incarcerated because he and his new attorney thought trial counsel Tom Wilbern could have done some things better to have made the ten-year deferred adjudication happen.  (Docket Entry No.7-30, page 29).  He later testified that they thought Wilbern should have put on witnesses at the punishment hearing to testify to the danger Salazar faced in prison because he had testified in a capital murder trial where the defendants received life sentences. (*Id.*, pages 29, 47-56).

[12] Salazar testified during the punishment hearing that neither the prosecutor nor investigating officers made any promises as to what his sentence would be.  (Docket Entry No.7-29, page 19).  He further testified that no one guaranteed that he would be placed on probation for a specific number of years.  (*Id.*).  Salazar indicated that the State agreed to cap his punishment at thirty years.  (*Id.*).

at the time of the punishment hearing that the range of punishment was deferred probation to 30

years in the penitentiary because nothing had changed.  (*Id.*, pages 84-85).  He indicated that

Salazar never gave him any indication that he believed he was going to get probation.[13]   (*Id.*,

page 85).

When questioned by the state district court, Wilbern testified to the following, in

pertinent part:

> I told him that he had the possibility of receiving a ten-year deferred
> probation and that is what our ultimate goal was to get from the Judge and
> we had to go to the Judge for that.  And he had – we had to go through the
> PSI investigation and he had to do all the things that the State had asked
> him to do as far as testifying truthfully and honestly at both trials.

(*Id.,* page 111).

Petitioner fails to rebut the state habeas court's findings with clear and convincing

evidence of any understanding or agreement as to Salazar's future prosecution that would be

relevant to his credibility.  Petitioner conceded during state habeas proceedings that Salazar did

---

[13] Attorney Thomas Wilbern also attested by affidavit in state habeas proceedings that "[t]here were NO additional
provisions of the agreement with the State that are not contained in the written agreement and Mr. Salazar was never
offered or promised any specific punishment by any representative of the State or by me.  Mr. Salazar was never
guaranteed, offered, promised, or led to believe in any way by any representative of the State, or by any person
including myself, that he would receive a probated or deferred sentence in cause number 942359 in exchange for his
cooperation with the State in relation to Mr. Hernandez's and Mr. Pena's cases."  (Docket Entry No.7-30, page 138)
(emphasis in original).  Wilbern explained his testimony at the hearing on the Motion for New Trial as follows, in
pertinent part:

> I believed at the time of Mr. Salazar's sentencing that Mr. Salazar would receive a
> deferred sentence from the Court.  Though I held this belief and hope at that specific time
> right before sentencing in the pre-sentence investigation hearing - I never communicated
> it to Mr. Salazar and at all times informed Mr. Salazar that he was subject to the full
> range of punishment (with a cap of 30 years) in this case and Mr. Salazar indicated to me
> that he understood and knew that he was not promised or guaranteed any specific
> punishment in this case.  Both Mr. Salazar and myself knew and discussed the fact that
> there was a possibility that the court could give Mr. Salazar a deferred sentence but at no
> time did I tell him or did he communicate to me that he believed in fact
> receive a deferred sentence from the court.  We both hoped that he would receive a
> deferred sentence from the court- but both knew that he may not get a deferred sentence
> from the court.

(*Id.*, page 139).

not confess to any other offenses and his failure to inform the jury of that part of his agreement is either moot or harmless.  Petitioner fails to show that Salazar did not disclose to the jury the prosecutor's offer to report his cooperation to the sentencing judge.  For these reasons, he fails to show that his due process rights pursuant to *Brady* were violated and that the state habeas courts' adjudication of his claims was unreasonable.

### B. Rights to Present a Defense and to Confront Witness

Petitioner contends the state district court violated his rights to due process and to present a defense and his right to confrontation when it found inadmissible the testimony of witness Petra Cortina regarding her written statement.[14]   (Docket Entry No.1, pages 22-25).  During the cross-examination of Cortina, petitioner's trial counsel approached the bench to discuss Cortina's written statement, as follows:

> Judge, in her statement she told the police that the day after they had sold the guns my client comes back and tells her about the robbery.  He tells her that basically Nano[15] killed.  That it wasn't supposed to happen that way.  That they went in there with the intent to rob, but Nano killed him.
>
> I'm declaring that's admissible as a declaration against interest.  It also goes—because they're going to argue under 702 that my client should have anticipated what Nano was going to do.  This goes to show his state of mind at the time of the robbery to establish that he couldn't have anticipated what occurred.  Also it was a declaration against interest by admitting that he was involved in the robbery and that he planned the robbery, but he didn't plan the killing and that wasn't part of the action.

(Docket Entry No.7-45, pages 21-22).  The prosecutor responded, "I believe that it can come in as a prior consistent statement after the defendant testifies, but I believe at this point it's

---

[14] Earlier, petitioner's counsel asked Cortina about her written statements to police and whether she had described the bad things that Pena had done, to which she responded affirmatively.  (Docket Entry No.7-45, page 20).  He asked if she had described one bad thing that petitioner had done or whether it was all about Pena.  (*Id.*).  Cortina did not answer and the court called the attorneys to the bench.  (*Id.*, page 21).  After further questioning, petitioner's trial counsel approached the bench about the contents of the written statement.  (*Id.*).  Thereafter, when questioned if she spent very little time discussing petitioner with the police, Cortina responded, "Correct."  (*Id.*).

[15] Trial records reflect that Juan Pena's nickname is Nano.

hearsay." (*Id.*, page 22).  The state district court sustained the objection.  (*Id.*).  Petitioner's trial counsel did not call Cortina to testify after petitioner testified.

Petitioner complained on direct appeal about the exclusion of Cortina's testimony that petitioner told her that he only intended to rob complainant and that Juan Pena killed complainant.  *Hernandez v. State*, 171 S.W.3d 347, 355 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd).  Petitioner contended on appeal that the statement was admissible as a statement against interest and to show his state of mind to counter the State's position that he was a party to capital murder.  *Id.* at 355-56.  The state appellate court rejected this contention under state evidentiary rules.  *Id.* at 356.

Petitioner also objected that the exclusion of the statement deprived him of due process.  *Id.* at 357.  The state appellate court did not review this ground because petitioner failed to preserve error for appellate review by voicing the same objection at trial.  *Id.*

Petitioner further challenged the exclusion of Cortina's trial statement in state habeas proceedings on grounds that he was denied his right to present a defense and to confront a witness.  (Docket Entry No.7, pages 13-14).  The state habeas court entered factual findings based on the appellate record, which petitioner does not challenge.[16]  The state habeas court

---

[16] The state habeas court entered the following findings, in pertinent part:

> 12.    The Court finds, based on the appellate record in Hernandez' trial, that the applicant attempted to elicit testimony from State's witness Petra Cortina on cross-examination that the applicant told Cortina he only intended to rob Harrell and that Pena had actually killed Harrell; the trial court sustained the State's objection to the statement as hearsay.

> 13.    The Court finds, based on the appellate record in Hernandez' trial, that it was apparent from the record and circumstances at trial that the applicant's defense was that Pena had actually killed Harrell without the applicant's prior knowledge and that the killing was not reasonably foreseeable under the facts; however, the Court finds the facts of such defense – offered through Cortina – were not sufficiently developed at trial; additionally, the applicant was able to testify to said facts and therefore, there was no harm caused by the exclusion of Cortina's testimony as proffered to the trial court.

found that petitioner had failed to show harm by the exclusion of Cortina's testimony because petitioner testified to his defense that Pena was the shooter and it was not reasonably foreseeable that the killing would take place, and because Cortina's testimony was not fully developed in the proffered defense theory at trial and habeas proceedings.  (*Id.*, page 102).  The state habeas court further concluded that petitioner was afforded an opportunity to present evidence and did present evidence by his testimony at trial; therefore, he was not denied the right to present a meaningful defense by the State's objection to Cortina's testimony.  (*Id.*).

Petitioner contends in the present action that he sought to elicit Cortina's testimony to show his state of mind to counter the State's position that he was a party to capital murder and to support his defense the he only intended to rob complainant.  (Docket Entry No.1, pages 22-23).  Petitioner claims that "[t]he State capitalized on the exclusion of Petitioner's statements made to their witness, Petra Cortina, at closing argument by undermining Petitioner's defense that Pena's act in shooting the complainant with his own gun was an unforeseen act." (*Id.*, page 24).

"Few rights are more fundamental than that of an accused to present witnesses in his own defense.  In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and

---

14.    The Court finds that on direct appeal the applicant alleged that the trial court erred in excluding Cortina's testimony and that the exclusion of her testimony violated his constitutional right to due process because it prevented him from presenting a defense; the Court of Appeals held that the trial court did not err in excluding Cortina's testimony because the statement was not admissible as a statement against interest or to show the applicant's state of mind; the Court of Appeals further held that the applicant failed to preserve his complaint of constitutional error.

15.    The Court finds, based on the appellate record in Hernandez' trial, that the applicant testified at trial in the primary case that he only planned to rob Harrell, that neither he nor Pena brought a weapon into Harrell's home, that Pena was the one who actually shot Harrell, and the applicant did not plan or intend the shooting.

(Docket Entry No.7-1, pages 92-93) (citations to record omitted).

reliability in the ascertainment of guilt and innocence." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (citations omitted).  A defendant does not have an "unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence," *Taylor v. Illinois*, 484 U.S. 400, 410 (1988), "but a restriction on the defendant's right to introduce testimony may not be arbitrary or disproportionate to the purpose it is designed to serve." *Kittelson v. Dretke*, 426 F.3d 306, 320 (5th Cir. 2005).

"The Confrontation Clause of the Sixth Amendment, made applicable to the States through the Fourteenth Amendment, provides: 'In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.'" *Idaho v. Wright*, 497 U.S. 805, 813 (1990).   Criminal defendants receive two valuable protections from the Confrontation Clause-the right to physically face those who testify against them and the right to cross-examine those witnesses.  *Coy v. Iowa*, 487 U.S. 1012, 1016-17 (1988).  "[T]he right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer v. Texas*, 380 U.S. 400, 405 (1965). The Confrontation Clause does not, however, grant defense attorneys unbridled authority to cross-examine witnesses on whatever topic they or their clients deem suitable.  Trial judges retain the discretion to impose reasonable limits on cross-examination consistent with the applicable rules of evidence.  *See Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).  A complaint, as in this case, that the trial court unduly restricted cross-examination of a state's witness is a mixed question of fact and law, and on federal habeas review is subject to harmless error analysis under *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

The record, in this case, shows that petitioner's attempt to cross-examine Cortina was denied by the state district court because at the time he sought to question her, defendant had

not testified.   Therefore, at that time Cortina's testimony was inadmissible hearsay under standard state evidentiary rules.   The state district court's evidentiary rulings are matters of state law which are not subject to re-examination by the federal courts.   It is not "the province of a federal habeas court to reexamine state-court determinations on state-law questions.   In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.   *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

"[A] federal court may grant habeas relief based on an erroneous state court evidentiary ruling only if the ruling also violates a specific federal constitutional right or renders the petitioner's trial fundamentally unfair."   *Gochicoa v. Johnson*, 118 F.3d 440, 446 (5th Cir. 1997).   Petitioner implies by his citation to *United States v. Scheffer*, 523 U.S. 303, 308 (1998), that the evidentiary rules upon which Cortina's testimony was excluded are "arbitrary and disproportionate to the purposes they are designed to serve."   (Docket Entry No.1, page 23).   The cases that petitioner cites in support of this claim[17] do not address well-established evidentiary rules regarding hearsay and therefore, are distinguishable from the present case.   He proffers nothing to show that the hearsay rules employed by the state district court were erroneous, arbitrary, or disproportionate to the purposes they are designed to serve in this case.

Petitioner's claim that the prosecutor capitalized on the exclusion of petitioner's statements made to their witness, Petra Cortina, at closing argument by undermining petitioner's defense that Pena's act in shooting the complainant with his own gun was an unforeseen act is without support in the record.   At most, the prosecutor commented on Cortina's body language when she took the stand as an indication that she was afraid of petitioner.   (Docket Entry No.7-

---

[17] *Holmes v. South Carolina*, 547 U.S. 319 (2006); *United States v. Scheffer*, 523 U.S. 303 (1998); *Crane v. Kentucky*, 476 U.S. 683 (1986).

12, page 28).   Instead, the record of the closing argument shows that petitioner's counsel attempted to use the excluded testimony to show that Cortina was not fearful of petitioner[18] and to corroborate his testimony that Juan Pena did the shooting.[19]

Petitioner does not contest that he provided the same testimony at trial that he sought from Cortina.   He argues the state habeas court's finding of no harm was erroneous because Cortina's excluded testimony went to the heart of his defense; consequently, his uncorroborated testimony did not carry the same weight and consideration before the jury that it would have if first provided by state witness Cortina.   (Docket Entry No.13, page 11). Petitioner, however, is unable to establish harm under *Brecht* for the reasons stated by the state habeas court.   At the time he sought to cross-examine Cortina, her testimony was undeveloped. He did not call her to testify to corroborate the testimony that he gave during his case-in-chief.

---

[18] Petitioner's counsel emphasized Cortina's written statement in closing argument, as follows in pertinent part:

> And there is not doubt, once again, her fear of the person was Nano.  She is scared of Nano. . . . She also told you, didn't go into detail, but my client came back the day after the sale and told her how it happened, told her how it happened.  And you saw her  true fear, even though the State is trying to tell you that she was fearful of my client. . . And as we learned on cross-examination in her written report to the police, she wrote an extensive or they wrote an extensive paragraph of her describing the violent acts that Nano did."

(Docket Entry No.7-12, page 19).  The state district court sustained an objection to the testimony and instructed the jury to disregard it.  (*Id.*).

[19] Thereafter, petitioner's counsel argued:

> If you recall, I asked her, isn't it true that you spent a lot of time describing certain things that Nano had done.  She said, Yes.  I asked her, Isn't it true that nowhere in your statement did you describe anything that my client did?  She said, That's correct.  Her whole statement was written. . . . And don't you know, ladies and gentlemen, if my client had made a true confession to her that he was the killer, that he was the person, that he was the one that planned the killing that he intentionally did it, they would have had her up there talking about what my client had said and what – and how he described it.  The basis is what he told you, I told her that Nano did the killing and told her how it happened.

(Docket Entry No.7-12, page 19).

In short, he proffers nothing to overcome the state habeas court's finding that the exclusion of the same, if error, was harmless under *Brecht.*

Accordingly, respondent is entitled to summary judgment on this claim.

<u>C. Inconsistent Theories</u>

Petitioner contends that his conviction violates his right to due process because the State used a theory to secure petitioner's conviction for capital murder that was inconsistent with the theory used to convict co-defendant Pena. (Docket Entry No.1). Petitioner maintains at his trial, the State contended that petitioner intended to kill complainant and steal complainant's guns, but at Pena's trial, the State contended that Pena shot and killed complainant. (*Id.,* page 26). Petitioner maintains that the State's position at Pena's trial was consistent with his theory of defense, *i.e*., that petitioner did not intend to kill complainant and it was not foreseeable that Pena would shoot and kill complainant. (*Id.*).

Petitioner contends that the State's theory at his trial was that petitioner recruited Pena for the purpose of murdering complainant and objected to the admission of evidence from Cortina showing that petitioner only intended to steal the guns and that after the shooting he was afraid of Pena. (*Id.*, page 28). He claims at Pena's trial, "the State actually elicited this evidence from Cortina along with additional testimony that Pena threatened to kill Cortina and Petitioner if he said anything about Pena after shooting complainant." (*Id.*). Petitioner complains that the State's objection to the admission of the same evidence at his trial is "akin to the State withholding evidence favorable to Applicant's defense." (*Id*., pages 26-27).

The state habeas court found that "the State did not elicit in Pena's trial the same testimony from Cortina that it objected to during the applicant's trial." (Docket Entry No.7-1, page 93). The state habeas court also found that the prosecution argued at the trials of Pena and

petitioner that the jury could find the defendant guilty of capital murder if the defendant specifically intended to cause complainant's death by shooting him, was a party to the shooting with the intent of killing complainant, or should have anticipated that complainant would be killed in the furtherance of a conspiracy to rob complainant.  (*Id.,* page 94).  The state habeas court found that "the State did not present inconsistent or contradictory theories as to the identity of Harrell's shooter" and "that the State presented consistent theories at both trials that the State did not have to prove whether the applicant or Pena shot Harrell and that the jury could find the applicant and Pena guilty under any of the theories contained in the court's charge."  (*Id.*, pages 94-95).   The state habeas court concluded as a matter of law that petitioner failed "to demonstrate that the State presented inconsistent or contradictory theories of guilt at the applicant's and Pena's trials such that the applicant was denied due process."  (*Id*., page 102).

Petitioner fails to rebut the fact findings of the state habeas court.  The record shows that the State did not elicit in Pena's trial the same testimony from Cortina that it objected to during the applicant's trial.[20]  Although the prosecution asked Cortina if petitioner told her

---

[20] On redirect examination of Cortina at Pena's trial, the prosecutor sought to introduce evidence to rebut defense counsel's inferences regarding Cortina's reluctance to testify.  (Docket Entry No.16-2, page 185)  The prosecutor sought to elicit testimony showing that Cortina was afraid because she feared retaliation from Pena's friends and family, some of whom still lived in her neighborhood and were present in court that day.  The prosecutor queried Cortina, as follows in pertinent part:

Q.      When this defendant told you if any of this got out he'd kill you, did you know what he was talking about?

A.      I didn't know what he meant by that, that time, until Mando told me what had happened.

Q.      When did Mando tell what had happened?

A.      The next following day or two days later.

Q.      Where did that conversation between you and Mando occur?

A.      I don't remember.

*     *     *     *     *

Q.      [W]hen Mando was telling you about what happened on the night of the 29th, how was he acting?

A.      He was nervous.  I didn't understand why he was nervous and I kept asking him, what's wrong, what's wrong.

Q.      Did he seem upset?

A.      Yes.  He told me –

Mr. Bourque:      Objection to hearsay.

A.      He told me I didn't want to know.

The Court:      Sustained.

Q.      (By Mrs. Magness)  Just a minute.  When you say he was nervous, how was he acting?

A.      Nervous.  Scared.

Q.      Was he upset?

                              *    *    *    *    *

A.      Like he really didn't want to talk to me.  But, like the way I saw it, Just tell me what's going on, what's wrong?  He goes, "You don't want to know."  I said, "Yes, I do. Probably I can help."

        And when he did tell me, I did not want to know.  He was right.  I did not want to know, but he had already done told me."

Q.      So a day or two after all of this happened, Mando told you what happened inside Chris' house?

A.      Yes.

Q.      And at the time that he told you, he was nervous and upset?

A.      Un-huh.  Yes.

Q.      Did Mando tell you who shot Christopher Harrell?

Mr. Bourque:      Objection to hearsay.

The Court:      Sustained.

                              *    *    *    *    *

Q.      Mr. Bourque has asked you about in your statements why you hadn't told – or why you didn't tell everything that you knew about this defendant.  Do you remember him asking you that question?

A.      They were still out there.  They weren't in jail.  They were out there.

who shot complainant, the state district court sustained a hearsay objection to such testimony. (Docket Entry No.).  The state district court's charge to the jury in the Pena case authorized a capital murder conviction on the same theories as in petitioner's case.  (Docket Entries No.7-20, pages 3-18; No.7, pages 7-37, pages 154-162).  The prosecutor argued at both trials that the jury could find the defendant guilty of capital murder if the defendant specifically intended to cause complainant's death by shooting him, was a party to the shooting with the intent of killing complainant, or should have anticipated that complainant would be killed in the furtherance of a conspiracy to rob complainant.  (Docket Entries No. 7-12, pages 8-9; No.16-2, pages 266-267).

Some circuits have found that "the use of inherently factually contradictory theories violates the principles of due process."  *United States v. Higgs*, 353 F.3d 281, 326 (4th Cir. 2003) ("In some situations, the Due Process Clause prohibits the government from presenting mutually inconsistent theories of the same case against different defendants"); *Smith v. Groose*, 205 F.3d 1045, 1052 (8th Cir. 2000) ("To violate due process, an inconsistency must exist at the core of the prosecutor's cases against defendants for the same crime").  In this circuit, however, "[i]t is well-established that the use of inconsistent theories in the separate trials of co-defendants is not a violation of the due-process clause."  *Pondexter v. Quarterman*, 537 F.3d 511, 527 (5th Cir. 2008).

---

Q.      On the first one, he was still out there.  On the second one, you had already been picked up.  Listen to my question, okay?  Listen to my question.

Why are you so afraid to tell everything that you know about this defendant?

\*      \*      \*      \*      \*

A.      I've been around them so I know what kind of people they are.

(*Id.*, pages 186-188).

Contrary to petitioner's assertion, the State's theory in the present case and its theory in the Pena case are not "factually contradictory," factually irreconcilable, and without evidentiary support in the record.  Any inconsistencies in the State's theory of each case were immaterial to the conviction since both Pena and petitioner could have been convicted for the same offense as a party to the offense.  *See United States v. Paul*, 217 F.3d 989, 998-99 (8th Cir. 2000) ("When it cannot be determined which of two defendants' guns caused a fatal wound and either defendant could have been convicted under either theory, the prosecution's argument at both trials that the defendant on trial pulled the trigger is not factually inconsistent"); *cf. Bradshaw v. Stumpf*, 545 U.S. 175, 187 (2005) (upholding a guilty plea where the defendant's assertions of inconsistency related entirely to which individual shot the victim but where "the precise identity of the triggerman was immaterial to [defendant]'s conviction for aggravated murder").

Petitioner fails to show his entitlement to federal habeas relief under the AEDPA standard; therefore, respondent is entitled to summary judgment on this ground.

## III. CERTIFICATE OF APPEALABILITY

A certificate of appealability from a habeas corpus proceeding will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  This standard "includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotations and citations omitted).  Stated differently, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.*; *Beazley v. Johnson*, 242 F.3d

248, 263 (5th Cir. 2001).   On the other hand, when denial of relief is based on procedural

grounds, the petitioner must not only show that "jurists of reason would find it debatable whether

the petition states a valid claim of the denial of a constitutional right," but also that they "would

find it debatable whether the district court was correct in its procedural ruling."   *Beazley*, 242

F.3d at 263 (quoting *Slack*, 529 U.S. at 484); *see also Hernandez v. Johnson*, 213 F.3d 243, 248

(5th Cir. 2000).   A district court may deny a certificate of appealability, sua sponte, without

requiring further briefing or argument.   *Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).

The Court has determined that petitioner has not made a substantial showing of the denial of a

constitutional right.   Therefore, a certificate of appealability from this decision will not issue.

## IV. CONCLUSION

Finding no unreasonable application of clearly established federal law in the

record of the state proceedings, the Court ORDERS the following:

1. Respondent's motion for summary judgment (Docket Entry No.10) is GRANTED.

2. Petitioner's petition for federal habeas relief is DENIED.

3. A certificate of appealability is DENIED.

4. All other pending motions are DENIED.

5. This habeas action is DISMISSED with prejudice.

The Clerk will provide a copy to the parties.

SIGNED at Houston, Texas, this 12th day of August, 2011.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE